FILED
2021 JAN 13
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JONATHAN ALEXANDER MORALES-LOPEZ, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO SUPPRESS <br><br> Case No. 2:20-cr-00027-JNP <br><br> District Judge Jill N. Parrish |

Before the court is defendant Jonathan Morales-Lopez's motion to suppress statements made during custodial police interviews on January 10, 2020 and January 15, 2020. ECF No. 40. The government concedes that the statements made on January 10 should be suppressed because the *Miranda* warning provided by the officers was inadequate. But the parties dispute whether the warning provided on January 15 was adequate. Considering the parties' evidence and legal arguments, the court finds that the *Miranda* warnings provided during the January 15 interrogation were not constitutionally adequate.

Accordingly, the court GRANTS Morales-Lopez's motion and suppresses statements made during the January 10 and January 15 interviews.

**FINDINGS OF FACT**

1. Morales-Lopez grew up in Guatemala speaking Spanish. He received the equivalent of an eighth-grade education in that country before moving to the United States at the age of 16 or 17. For a few months, Morales-Lopez attended a transitional program in a United States

high school focused on providing English language skills. He earned a grade point average of approximately 2.2. He then stopped attending classes regularly.

2. Morales-Lopez was arrested and taken into custody on January 10, 2020, after law enforcement responded to a report of two men stealing guns from a store. At the time of his arrest, he was 18 years old.

3. Police officers transported Morales-Lopez to a police station.

4. Officers handcuffed Morales-Lopez and placed him in an interview room for questioning.

5. In English, an officer told Morales-Lopez that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to have an attorney present during any questioning, and that if he decided to answer questions at that time without having an attorney present that he could stop answering questions at any time and request an attorney.

6. The officer asked Morales-Lopez if he understood these rights. He responded, "no."

7. The interrogating officer then obtained the assistance of a Spanish-speaking officer to interpret. The officer told Morales-Lopez in Spanish that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to have an attorney present during any questioning, and that if he decided to answer questions at that time without having an attorney present that he could stop answering questions at any time and request an attorney.

8. Neither the interrogating officer nor the Spanish-speaking officer told Morales-Lopez that if he could not afford to pay for an attorney, one would be provided to him free of charge.

9. The officers interviewed Morales-Lopez and he made several statements during the interrogation.

10. Morales-Lopez remained in custody and on January 15, 2020, two ATF agents interviewed him.[1]

11. Officer 1 began the interview. His native language is English, and his second language is Portuguese. He speaks Spanish with a heavy accent. At best, his proficiency with Spanish is intermediate.

12. In English, Officer 1 asked Morales-Lopez whether he had been interviewed before. He responded in broken English:

> Oh yeah, I been talking before but they told me like "you need to be in silence" and "you need to defensor" or something like that, "you need to be quiet." Then they took me to a room like this and then they start to ask me questions, like, I didn't understood all what they . . . said to me.

13. Officer 1 stated in English: "[L]et me just read you your rights so you understand them, Okay? I have them in Spanish here. You can read Spanish, right?" Morales-Lopez responded with the Spanish equivalent of "uh huh."

14. In Spanish,[2] Officer 1 read from the ATF's Spanish-language *Miranda* waiver form. His recitation from the form included the following admonitions:

   a. Officer 1 misread the first line of the form stating: "If you have the right to remain silent." Officer 1 asked, "Okay? Understand?" Morales-Lopez responded, "Uh huh."

---

[1] The transcript referrers to these agents as "Officer 1" and "Officer 2."

[2] All further statements made by Officer 1 and Morales-Lopez referenced in this Findings of Fact section were in Spanish. The statements have been translated into English by a certified translator.

    b. Officer 1 then stated: "Any statement of yours can be used against . . . against you at the . . ." Morales-Lopez interjected, "legal process." Officer 1 repeated, "legal process."

    c. Officer 1 stated: "You have the right to talk to an attorney before we ask you any questions and to have him present with you during the questions. If you don't have money to employ an attorney, one can be granted to you before we ask you any questions. If you decide to answer our questions, at this moment, without having an attorney present, you'll always have the right to stop answering . . . you . . . understand?" Rather than answer the question directly, Morales-Lopez stated: "Well, that depends on how serious the question is." Morales-Lopez then said that he had the ability to analyze the situation he was in, but that "I am not sure I'm making a mistake, it's just that I want to help myself get out of this hole. Because to me, this is a hole, you know? I would like to be at home, going to work . . ."

15. Unsure as to whether Morales-Lopez wanted to proceed, Officer 1 stated: "Okay, so you want an attorney before?" Moralez-Lopez responded "Mmm . . ."

16. Believing that Moralez-Lopez wanted to consult with an attorney before answering questions, Officer 1 attempted to end the interview, stating that he would come back the following day to take him to his court hearing. But Morales-Lopez continued to ask questions about his hearing and to request assistance in lifting the "hold federal" on his case. He asked Officer 1 if there was a way that he could "get out of this," acknowledging that he knew that he had "made a mistake." Officer 1 attempted to break off the interview two more times stating that he could not talk to him without an attorney and that he would see him the next day. But each time, Morales-Lopez continued to engage with Officer 1,

asking whether there was something that he could do to get out of jail faster and posing questions about his hearing the following day.

17. Finally, Officer 1 again stated that he could not ask any questions without an attorney present and that he could speak with Morales-Lopez later. He responded: "Ah, but what I don't want is to have this take more time, you know what I mean? If you want to ask your questions right now, it's ok, it's not a problem to me."

18. Referring to the Spanish-language *Miranda* rights waiver form, Officer 1 said, "Okay, if you want, if you want to talk, you need to write your signature here." Morales-Lopez responded, "Let's see. If not, if it's about a deportation, I can't sign." Officer 1 stated, "I can't make any promises. It's possible."

19. Officer 1 than asked, "Want to talk or not? . . . It's your, your decision."

20. Morales-Lopez then read the caption to the Spanish-language *Miranda* waiver form aloud asking "Waive, what? Notification and rights and waiver?" Officer 1 responded, "Yes. It's very important that you understand your rights." Morales-Lopez then stated:

> Hmm. It gives me a lot to think about . . . but in the name of God, I hope this is not something serious, you know? . . . You are not forcing me, you are just telling me that it's my own decision. Just to reduce the time that I may have to stay here.

Officer 1 corrected Morales-Lopez, stating, "It's not in my power."

21. About two minutes after Officer 1 told Morales-Lopez that he needed to "write his signature" if he wanted to talk, Morales-Lopez signed the waiver form. For the vast majority of that time, Morales-Lopez conversed with Officer 1 about a variety of subjects. At one point, Morales-Lopez and Officer 1 were silent for about 15 seconds, but the audio

recording of the interview does not reveal whether Morales-Lopez was reading the waiver form or considering his options.

22. The form signed by Morales-Lopez stated that:

   a. he had the right to remain silent;

   b. anything he said could be used against him in a legal proceeding;

   c. he had the right to speak to an attorney before being questioned and to have the attorney present during questioning;

   d. if he did not have enough money to hire an attorney, one could be provided to him before being questioned; and

   e. if he decided to answer questions without an attorney present, he would have the right to stop answering questions.

23. The form also had a waiver section, which recited that the signee had read the declaration of rights or it had been read to him, that he understood his rights, and that he was willing to answer questions without an attorney present. Morales-Lopez signed the waiver section of the form.

24. Morales-Lopez subsequently answered a series of questions posed by Officer 1. Offer 2, who spoke better Spanish, later entered the interrogation room and assisted in asking questions.

25. Morales-Lopez filed a motion to suppress the statements he made during the January 10 and January 15 interrogations. At the evidentiary hearing on the motion to suppress, Morales-Lopez presented the expert testimony of Dr. Fernando Rubio, a professor of Spanish linguistics. Dr. Rubio interviewed Morales-Lopez while he was being held in

pretrial detention in order to formulate an opinion on his comprehension of the *Miranda* warnings provided by Officer 1.

26. Based upon Dr. Rubio's testimony, the court finds that Morales-Lopez' Spanish reading skills were limited. The court also determines that the Spanish waiver form's notification of the right to remain silent did not use "high frequency vocabulary . . . that you would be exposed to in regular daily life interaction." Additionally, the court finds that the statement on the waiver form that the signee had read and understood the form and was willing to answer questions without the assistance of a lawyer was written in "fairly formal Spanish" and that it was above Morales-Lopez's level of cognitive sophistication. The court further concludes that based upon his Spanish reading skills, Morales-Lopez required more time and focused concentration than the average native Spanish speaker to read and understand the waiver form.

**LEGAL STANDARD**

Before conducting a custodial interrogation, law enforcement officers are required to tell a suspect "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). After receiving notice of these rights, the suspect must voluntarily and knowingly waive them before being questioned without an attorney. *Id.* at 444. A waiver is knowingly made if it is made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (citation omitted). If a suspect does not voluntarily and knowingly waive his *Miranda*

rights, statements made during the custodial interrogation are inadmissible at trial. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010).

"Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Spring*, 479 U.S. at 573 (citation omitted). "The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the [suspect's] age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). The prosecution bears the burden of proving a valid *Miranda* waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986).

## ANALYSIS

The government concedes that it did not obtain an adequate *Miranda* waiver prior to the January 10 interrogation because the officers did not notify Morales-Lopez of his right to have an attorney appointed to him if he could not afford one. Accordingly, all statements made during that interview are suppressed.

But the parties disagree as to whether Morales-Lopez properly waived his *Miranda* rights prior to his January 15 interrogation. Morales-Lopez argues that he did not knowingly waive his *Miranda* rights because Officer 1 did not adequately explain them to him. First, he argues that the ATF officer's oral recitation of his right to remain silent was defective. Second, he asserts that his signature on the written waiver form did not cure the defects in the oral recitation.

I.     **ORAL *MIRANDA* RECITATION**

When reciting Morales-Lopez's *Miranda* rights, Officer 1 mistakenly stated in Spanish, "If you have the right to remain silent." Morales-Lopez argues that this portion of the recitation of his rights was inadequate because Officer 1 transformed the declarative statement, "You have the right to remain silent," into a conditional sentence fragment devoid of any real meaning. The court agrees.

Although a translation of *Miranda* rights into a foreign language need not be perfect, the translation must be sufficient to convey the substance of those rights. *United States v. Hernandez*, 93 F.3d 1493, 1502 (10th Cir. 1996). Here, rather than informing Morales-Lopez of his right to remain silent, Officer 1 offered a confusing conditional statement. This mistranslation of the Miranda warning was serious enough to call into doubt whether Morales-Lopez understood his right to remain silent. *See United States v. Botello-Rosales*, 728 F.3d 865, 867 (9th Cir. 2013) (holding that a *Miranda* warning was inadequate where an officer translated the English word "free," as in without cost, to a Spanish word meaning "free," as in being available or at liberty to do something).

The government argues that court should consider the adequate recitation of his right to remain silent five days earlier at the January 10 interrogation when determining whether Morales-Lopez knowingly waived that right during the January 15 interrogation. But during the January 15 interrogation, he indicated that he had not understood the January 10 recitation of his *Miranda* rights. When Officer 1 asked in English whether Morales-Lopez had been interviewed before, he responded in halting English:

> Oh yeah, I been talking before but they told me like "you need to be in silence" and "you need to defensor" or something like that, "you need to be quiet." Then they took me to a room like this and then

9

>they start to ask me questions, like, I didn't understood all what they . . . said to me.

Both Morales-Lopez's distorted interpretation of his *Miranda* rights and his confession that he had not understood what the officers had told him about his rights indicate that the January 10 *Miranda* recitation had not helped him to understand his rights during the January 15 interrogation.

Thus, taking into account the totality of the circumstances surrounding the oral recitation of Morales-Lopez's *Miranda* rights—including Officer 1's limited Spanish language skills, the mistranslation of the right to remain silent, and Morales-Lopez's age and experience—the court determines that the government has not carried its burden of proving that Morales-Lopez had knowingly waived his rights prior to questioning.

## II. *MIRANDA* WAIVER FORM

Morales-Lopez also argues that his signature on the *Miranda* waiver form did not cure the inadequate oral recitation of his right to remain silent. The court agrees for two reasons.

First, the government has not produced sufficient evidence to prove that Morales-Lopez read the form. Officer 1 never asked him to read it. The officer told Morales-Lopez only that he had to "write his signature" on the form if he wanted to talk. Because Officer 1 was reading from the form when he gave his oral *Miranda* recitation, Morales-Lopez could have reasonably assumed that the officer had accurately read aloud the recitals on the form and that all he needed to do was decide whether to sign the waiver form or not.

The audio recording of the interrogation also gives little indication that Morales-Lopez carefully read the waiver form. About two minutes after Officer 1 presented the waiver form to Morales-Lopez and told him that he needed to sign it to continue the interview, the recording indicates that he had had begun to sign the document. But for most of this time, Morales-Lopez

was engaged in conversation with Officer 1. The longest pause in the conversation was about 15 seconds. The recording, however, does not reveal whether Morales-Lopez was reading the form or just considering his options. At one point, Morales Lopez reads from the caption of the waiver form and appears to ask what it is: "Waive what? Notification and rights and waiver?" But Officer 1 did not provide any substantive response to Morales-Lopez's query. There is no indication from the transcript or audio recording that Morales-Lopez read any other portion of the form. Moreover, the government did not call Officer 1 to testify whether Morales-Lopez read the waiver form prior to signing it. Therefore, the government has failed to produce any reliable evidence that he read the form.

Second, even if Morales-Lopez had attempted to read the form after Officer 1 presented it to him, the evidence shows that it would have been difficult for him to understand it. At the evidentiary hearing, Morales-Lopez presented the expert testimony of Dr. Fernando Rubio, a professor of Spanish linguistics. Dr. Rubio interviewed Morales-Lopez while he was being held in pretrial detention. Based upon this interview, he testified that Morales-Lopez had received the equivalent of an eighth-grade education in Guatemala before moving to the United States and that his Spanish reading skills were limited. Dr. Rubio also testified that the waiver form's notification that Morales-Lopez had the right to remain silent did not use "high frequency vocabulary . . . that you would be exposed to in regular daily life interaction." Additionally, Dr. Rubio opined that the statement on the waiver form that the signee had read and understood the form and was willing to answer questions without the assistance of a lawyer was written in "fairly formal Spanish" and that it was above Morales-Lopez's level of cognitive sophistication. Based upon his expertise in the Spanish language and his interview with Morales-Lopez, Dr. Rubio concluded that he had not understood the waiver form.

The court notes that it need not fully embrace Dr. Rubio's opinions for his testimony to be relevant to the question of whether Morales-Lopez would have understood the rights described on the *Miranda* waiver form. Based upon the evidence before it and Dr. Rubio's expert testimony, the court concludes that, at minimum, Morales-Lopez required more time and focused concentration than the average native Spanish speaker to read and understand the waiver form. Even if Morales-Lopez had attempted to read the form after Officer 1 presented it to him, the audio recording shows that he had little uninterrupted time to digest the information on the form. Given the absence of an opportunity to focus on understanding the form and Morales-Lopez's education level, the court finds that he did not have enough time to properly read and comprehend it before he signed it.

Thus, the court determines that the government has not carried its burden of proving that Morales-Lopez both read and adequately understood the waiver form. Accordingly, the information on the form did not cure the defects in Officer 1's misstatement during his oral *Miranda* warning.

## CONCLUSION

The court finds that the government has not proven that Morales-Lopez knowingly waived his *Miranda* rights during either the January 10 interrogation or the January 15 interrogation. Therefore, the court GRANTS the motion to suppress. At trial, the government may not introduce into evidence statements made during these interrogations.

DATED January 13, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge